# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 24-CV-4914 (RER) (PK)

————————————

DAVID REINER, JOSEPH REINER A/K/A YOSSI REINER, JCR PRINTING INC., RABBI MOSHE BERGMAN, CONGREGATION BNEI AVROHOM, TELE GO INC., BARUCH A. BOAS A/K/A AVI BOAS, CHAIM KOHN, INFINITE SOLUTIONS NY INC., ELLIOT BLUMENTHAL, RABBINICAL COURT OF BORO PARK, BEIS DIN BEIS YOSEPH, RABBI REUVEN PINCHAS ALT, RABBI ASHER LANDAU, MENDEL REINER, RABBI GERSHON SPIEGEL, BAIS DIN OF MECHON L'HOYROA, RABBI YECHIEL BLUM, BETH DIN CRC A/K/A BEIT DIN OF HISACHDUS, RABBI MENDEL SILBER, RABBI SHAIM SHLOMO ILIOVITS A/K/A SHLOMO CHAIM ILIOVITS A/K/A SHLOIME ILIOVITS A/K/A CHAIM ILIOVITS, CONGREGATION GALANTA OIR PNEI YEHOSHUA, RABBI ISAAC EICHENSTEIN, AND YOSEF FREUND

VERSUS

MENDEL PANETH AND SARAH PANETH A/K/A SURY PANETH

————————————

**MEMORANDUM & ORDER**

————————————

**RAMÓN E. REYES, JR., District Judge:**

This action arises from an adversary proceeding commenced in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") by Mendel Paneth ("Mr. Paneth") and his wife Sarah a/k/a Sury Paneth ("Mrs. Paneth") (collectively, "Plaintiffs") against twenty-three defendants ("Defendants"). (*See* ECF No. 20-5, Pls.' Ex. B ("Compl.")); *Paneth et al v. Reiner et al*, 24-ap-1006 (NHL) ("*Adversary Proceeding*"); *In re Mendel Paneth*, 22-bk-41414 (NHL) ("*Bankruptcy Proceeding*"). Plaintiffs allege one count of violations of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. §§ 1, 2; four counts of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; and an objection to three proofs of claim in the underlying

bankruptcy proceeding. (Compl. ¶¶ 317–41, 342–47, 348–53, 354–65, 366–72, 373–82). Before the Court are Defendants' various motions to dismiss and to compel arbitration.

After carefully reviewing the record, and for the reasons set forth below, the Court grants defendants David Reiner and Mendel Reiner's motion to compel arbitration (ECF No. 12), and grants each of the defendants' motions to dismiss (ECF Nos. 10, 13, 15, 16). Mr. Paneth's objections to Proofs of Claim Nos. 9 and 10 are stayed pending arbitration. The Court also *sua sponte* dismisses the claims against Yosef Freund for failure to state a claim.[1]

## **BACKGROUND**

I.    Factual Background[2]

The Court assumes familiarity with the underlying facts of this case. (*See* ECF No. 7 at 2–4). On October 24, 2014, Mr. Paneth, David Reiner, and nonparty Eli Nadler entered a joint venture agreement, forming a partnership to pursue Mr. Paneth's goal of creating a Yiddish comic book catered to the Hasidic Jewish community. (Compl. ¶¶ 2, 8–9; *see also* ECF No. 12-4, Joint Venture Agreement in English ("EJVA") at 2; ECF No.

---

[1] Yosef Freund did not file a motion to dismiss. Nevertheless, the Court addresses his claims *sua sponte*. District courts have the inherent authority to dismiss meritless claims *sua sponte*. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (per curiam) (affirming the district court's conclusion that it had the power to dismiss a frivolous action *sua sponte*); *Wachtler v. Cty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) ("The district court has the power to dismiss a complaint *sua sponte* for failure to state a claim.") (quoting *Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980)). Plaintiffs must be given notice and an opportunity to be heard, but a court can dismiss claims *sua sponte*, particularly where a defendant has neither been served nor appeared. *Alki Partners, L.P. v. Vatas Holding GMBH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011) (dismissing, *sua sponte*, claims against a non-appearing, non-moving defendant where motions by other defendants put the plaintiff on notice of the ground for dismissal), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) (summary order).

[2] The factual background is based on Plaintiffs' complaint filed in the underlying adversary proceeding, as well as documents attached to, deemed integral to, and incorporated by reference into the complaint, publicly filed court decisions, and public records. *See, e.g.*, *Levy v. Maggiore*, 48 F. Supp. 3d 428, 438 (E.D.N.Y. 2014) (collecting cases).

12-3, Joint Venture Agreement in Hebrew ("HJVA") at 2). The ownership interests were divided as follows: Mr. Paneth and David Reiner each owned 45%, and Nadler owned 10%. (Compl. ¶ 8; EJVA at 2). The joint venture agreement included an arbitration clause requiring Mr. Paneth, David Reiner, and Nadler to arbitrate "any dispute or question between them . . . only and exclusively before a third party who is acceptable to the parties," and that "under no circumstances shall they go before secular court in absence of rabbinical court permission." (EJVA at 8–9; *see* Reiner Mem. at 18).

On October 29, 2014, Mr. Paneth, David Reiner, and Nadler formed Kidline Enterprises, Inc. ("Kidline") with the same division of ownership as the partnership. Compl. ¶¶ 10; ECF No. 12-6, Ex. 4, Kidline Enterprises Inc. Certificate of Incorporation ("Kidline Cert. of Incorp.") at 3). Plaintiffs claim the incorporation voided the joint venture agreement. (Compl. ¶¶ 11 & n.2, n.6). Publishing its first Yiddish comic book issue in December 2014, Kidline was generating almost $500,000 in annual profit by 2019. (*Id.* ¶ 17). Kidline's ownership changed somewhat during that time period: Mr. Paneth transferred his ownership interest in Kidline to his wife, Mrs. Paneth, and David Reiner purchased Nadler's 10% ownership interest, affording him majority control (*Id.* ¶¶ 17 n.4, 64).

When business-related disputes arose between Mr. Paneth and David Reiner, they sought help from a rabbinical arbitrator to resolve their issues within the terms of the original arbitration clause. (*Id.* ¶¶ 18–20, 88). On May 11, 2020, Mr. Paneth and David Reiner signed a new, additional arbitration agreement, which stated they would arbitrate "all disputes and matters in difference whatsoever between them in any way connected or arising out of abovementioned controversy," *i.e.*, the business-related disputes, before

3

Rabbi Moshe Bergman of Congregation Bnei Avrohom. (*Id.* ¶¶ 36, 88, 92; ECF No. 12-8, 2020 Arbitration Agreement ("2020 Arb. Agreement") at 2). Four months later, Mrs. Paneth also agreed to be bound by the same 2020 arbitration agreement. (Compl. ¶¶ 157–63; 2020 Arb. Agreement at 3). Bergman's arbitration sessions and meetings with the parties occurred at Congregation Bnei Avrohom's facilities. (Compl. ¶¶ 89, 162).

Plaintiffs also had disputes with defendants Joseph Reiner a/k/a Yossi Reiner, JCR Printing Inc., Tele Go Inc., Baruch A. Boas a/k/a Avi Boas, Chaim Kohn, Infinite Solutions NY Inc, and Elliot Blumenthal (collectively, the "Vendor Defendants") over the various business services the Vendor Defendants provided to Kidline, including printing, telephone, information technology, legal, and administrative services. (*See id.* ¶¶ 59–63, 82–84, 119, 123, 142–43, 149, 179–92; Vendor Mem. at 9–11). Despite the 2020 arbitration agreement, Mrs. Paneth brought multiple actions, individually and on behalf of Kidline, in state court against David Reiner and the Vendor Defendants in 2020 and 2021. (Compl. ¶¶ 134, 138, 150, 152). The New York State Supreme Court granted the state court defendants' motions both to consolidate and dismiss Plaintiffs' various actions, and also to compel arbitration. (*Id.* ¶¶ 190–92; ECF No. 15-4, Bergman Ex. 3 ("Sup. Ct. Order")).

On January 19, 2021, frustrated with David Reiner's control over Kidline, Mr. Paneth formed Hundred Publications, LLC ("Hundred") to publish a new Yiddish-language magazine. (Compl. ¶¶ 214–17). Hundred published essentially the same content as Kidline did, but under a different name, and its magazines were distributed by Jewish grocery stores and retail outlets in Borough Park and the tri-state area. (*See id.* ¶¶ 261, 280–84). Mr. Paneth and David Reiner had additional disputes over Hundred (*see id.*

¶¶ 218, 223), and Plaintiffs allege that multiple rabbis and rabbinical arbitration entities offered their dispute-resolution services to help Mr. Paneth and David Reiner resolve their conflicts within a Jewish tribunal rather than the secular courts (*Id.* ¶¶ 225, 230). Plaintiffs assert that Beis Din Beis Yoseph ("Beis Yoseph") issued a writ and preliminary injunction ("Beis Yoseph Writ") declaring that no person was permitted to help Plaintiffs in any way with respect to Hundred, unless Plaintiffs submitted to rabbinical arbitration for their disputes with David Reiner; the Beis Yoseph Writ was distributed widely within the Hasidic community. (*Id.* ¶¶ 244–50, 256). Plaintiffs also assert that Bais Din of Mechon L'Hoyroa distributed a document that discouraged community members from purchasing copies of Hundred. (*See id.* ¶ 278). According to the complaint, defendant Mendel Reiner assisted his brother David Reiner in disseminating the Beis Yoseph Writ, the Mechon L'Hoyroa document, and other related information to community members and potential customers of Hundred. (*See id.* ¶¶ 248, 252, 256, 261). Plaintiffs claim that Mendel Reiner and "his agents" caused the "forceful removal" of Hundred magazine from Jewish grocery stores in the tri-state area. (*Id.* ¶¶ 261, 264, 280–84).

Facing financial struggles allegedly caused by Plaintiffs' disputes with David Reiner and the other defendants, Hundred published its final issue in May 2022. (*Id.* ¶ 288). On June 19, 2022, Mr. Paneth filed for Chapter 11 bankruptcy (the "Bankruptcy Proceeding"), which automatically stayed arbitration proceedings before Rabbi Bergman. (*Id.* ¶ 291; ECF No. 21-5, Pls.' Ex. E ("Bankr. Docket") at 2).

II.    Procedural History

In the underlying Bankruptcy Proceeding, Plaintiffs filed an adversary complaint against twenty-three defendants, alleging Sherman Antitrust Act and RICO violations, an

objection to three proofs of claim in the underlying bankruptcy proceeding. (Compl. ¶¶ 317–41, 342–47, 348–53, 354–65, 366–72, 373–82). On April 2, 2024, Defendants filed a motion to withdraw the reference from Bankruptcy Court. (ECF No. 1). On July 15, 2024, the Court granted Defendants' motion pursuant to 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules of Bankruptcy Procedure, and Local Rule 5011-1 of the Bankruptcy Court. (ECF No. 7). After Plaintiffs' motion to stay was denied (Order dated 7/19/2024) and an extension granted (Order dated 9/3/2024), the parties timely filed all pending motion papers from the underlying adversary proceeding, along with oppositions and replies. Before this Court are five separate motions to dismiss Plaintiffs' adversary complaint from the underlying adversary proceeding.

First, Defendants David Reiner and Mendel Reiner (together, the "Reiner Defendants") filed their motion to compel arbitration and, in the alternative, to dismiss the complaint on July 23, 2024. (ECF No. 12 ("Reiner Mot."); ECF No. 12-1 ("Reiner Mem."); (ECF No. 29 ("Reiner Reply"); *see also* ECF No. 20 ("Pls.' Reiner Opp.")).

Second, the Vendor Defendants filed their motion to dismiss for failure to state a claim on July 22, 2024. (ECF No. 10 ("Vendor Mot."); ECF No. 11 ("Vendor Mem."); (ECF No. 27 ("Vendor Reply"); *see also* ECF No. 21 ("Pls.' Vendor Opp.")).

Third, Defendant Congregation Bnei Avrohom ("Congregation") filed its motion to dismiss for failure to state a claim on July 23, 2024. (ECF No. 13 ("Congregation Mot."); ECF No. 14 ("Congregation Mem."); (ECF No. 28 ("Congregation Reply"); *see also* ECF No. 22 ("Pls.' Congregation Opp.")).

Fourth, Defendant Rabbi Moshe Bergman ("Bergman") filed his motion to dismiss on July 23, 2024. (ECF No. 15 ("Bergman Mot."); ECF No. 15-5 ("Bergman Mem."); ECF No. 31 ("Bergman Reply"); *see also* ECF No. 23 ("Pls.' Bergman Opp.")).

Fifth, Defendants Rabbinical Court of Boro Park, Beis Din Beis Yoseph; Rabbi Reuven Pinchas Alt; Rabbi Asher Landau; Rabbi Gershon Spiegel; Bais Din of Mechon L'Hoyroa; Rabbi Yechiel Blum; Beth Din CRC a/k/a Beit Din of Hisachdus; Rabbi Mendel Silber; Rabbi Shaim Shlomo Iliovits; Congregation Galanta Oir Pnei Yehoshua; and Rabbi Isaac Eichenstein (collectively, the "Rabbi Defendants") filed their motion to dismiss for failure to state a claim and lack of jurisdiction on July 25, 2024. (ECF No. 16 ("Rabbi Mot."); ECF No. 16-1 ("Rabbi Mem."); (ECF No. 26 ("Rabbi Reply"); *see also* ECF No. 24 ("Pls.' Rabbi Opp.")).[3, 4]

## <u>LEGAL STANDARD—MOTION TO DISMISS</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the court "must accept as true all of the allegations contained in a complaint," that tenet "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[3] Plaintiffs claim that Defendant Yosef Freund is also included in the allegations against the Rabbi Defendants. (Pls.' Rabbi Opp. at 1 n.2). However, counsel for the Rabbi Defendants, DL Partners, states that it is not representing Yosef Freund and that the Rabbi Motion "was not filed on behalf of Yosef Freund, nor did we file a notice of appearance on his or her behalf." (Rabbi Reply at 3 n.1).

[4] Because the other defendants' motions to dismiss incorporate by reference the arguments in the Reiner Defendants' Memorandum (Vendor Mem. at 5 n.4 (incorporating arguments for the RICO claims); Bergman Mem. at 3 n.1; Congregation Mem. at 2 n.1 (also incorporating the arguments in Bergman's Memorandum); Rabbi Mem. at 4 (also incorporating by reference the arguments made by any other defendants)), the Court will consider, as applicable, the Reiner Defendants' arguments with respect to the claims against any other defendants.

"[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). A court must draw from "judicial experience and common sense," as well as case-specific context, to determine whether claims for relief are plausible, rather than merely possible. *Iqbal*, 556 U.S. at 679. Speculative factual allegations must be dismissed. *See Kenshoo, Inc. v. Aragon Advert., LLC*, 586 F. Supp. 3d 177, 186 (E.D.N.Y. 2022) ("Speculative, conclusory, or indefinite factual allegations are just as infirm as legal conclusions.").

## **DISCUSSION**

I.    Motion to Compel Arbitration Is Granted

Defendants David Reiner and Mendel Reiner move the Court to compel arbitration of Plaintiffs' Sherman Act and civil RICO claims. (Reiner Mot.; Reiner Mem.). The Reiner Defendants argue that Plaintiffs clearly and unambiguously agreed to arbitrate all disputes between themselves and David Reiner, including the types of issues in this case, as manifested through multiple written and signed agreements and the fact that Plaintiffs started and actively participated in arbitration with David Reiner before Mr. Paneth filed for bankruptcy. (Reiner Mem. at 20–28). Furthermore, the Plaintiffs are estopped from avoiding arbitration by the Kings County Supreme Court's decision compelling arbitration, pursuant to the doctrines of collateral estoppel, Full Faith and Credit, and *Rooker–Feldman*. (*Id.* at 29–33). The Reiner Defendants also assert that Plaintiffs are equitably estopped from avoiding arbitration of their claims against Mendel Reiner, because those claims are inextricably intertwined with their claims against David Reiner. (*Id.* at 33–34).

Plaintiffs reject these arguments and counter that, pursuant to the law-of-the-case doctrine and res judicata, this Court may not compel arbitration because Bankruptcy Judge Lord previously denied a motion to compel arbitration in a separate adversary proceeding David Reiner and Kidline brought against Mr. Paneth in 2022. (Pls.' Reiner Opp. at 13–19). Defendants reply that law-of-the-case and res judicata do not apply because there is no overlap of issues between the 2022 adversary proceeding, which involved the core bankruptcy issue of dischargeability of debts and in which Judge Lord issued her decision, and the 2024 adversary proceeding before this Court, which involves alleged Sherman Act and RICO violations. (Reiner Reply at 8–11).

The Court addresses the Reiner Defendants' motion to compel before proceeding to Defendants' motions to dismiss the substantive antitrust and RICO allegations.

A. Plaintiffs' Law-of-the-Case and Res Judicata Defenses Do Not Preclude Arbitration

As a threshold matter, the Court addresses Plaintiffs' contention that the Reiner Defendants are precluded from compelling arbitration because they are bound by the Bankruptcy Court's decision denying David Reiner and Kidline's motion to compel arbitration in the 2022 adversary proceeding. (Pls.' Reiner Opp. at 13–18). The Court disagrees.

As the Reiner Defendants correctly note, the issues in the 2022 adversary proceeding, which David Reiner sought to arbitrate, do not overlap with those in the present 2024 adversary proceeding. *See In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 512 (Bankr. S.D.N.Y. 2002) ("While the doctrine of the law of the case prevents re-litigation of the same issues, it does not preclude further determinations of different or new issues currently before the Court."). The 2022 proceeding involved core bankruptcy

issues such as dischargeability of debt, which must be addressed by the bankruptcy court and cannot be arbitrated. *See Reiner v. Paneth*, No. 24-CV-1402 (RER), 2025 WL 2663968, at *2–4 (E.D.N.Y. Sept. 17, 2025) (affirming bankruptcy court's denial of a motion to compel arbitration where the adversary proceeding involved dischargeability, a core bankruptcy issue). This 2024 proceeding, by contrast, involves non-core Sherman Act and RICO claims, which are separate issues and, as noted above, may proceed in any court.

Res judicata also does not apply because the adversary proceedings involve different causes of action and different parties: The 2022 adversary proceeding does not involve Mendel Reiner, and the 2024 adversary proceeding does not involve Kidline. *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 221–22 (2d Cir. 2012) (holding that *res judicata* applies in later litigation if case "involve[s] the same parties or their privies" and "the same cause of action" (citation omitted)). Furthermore, the Bankruptcy Court made its decision based on an incomplete factual record, different from the one before this Court.[5]

Accordingly, Plaintiffs' law-of-the-case and res judicata arguments do not bar arbitration.

---

[5] The Bankruptcy Court did not have the following documents and information before it, all of which are in the current factual record: the original Hebrew joint venture agreement with all parties' signatures (HJVA); a certified English translation of the Hebrew-language 2014 joint venture agreement (EJVA; ECF No. 12-5 (translation certificate of accuracy)); the "corporation filings" referenced in the joint venture agreement, including the certificate of incorporation for Kidline Enterprises, Inc. and articles of organization for Kindline Enterprises LLC, which demonstrate there is no conflict between those agreements and the joint venture agreement's arbitration provision (see Kidline Cert. of Incorp.; ECF No. 12-7, Kindline Articles of Organization ("Kindline Art. of Org.")); and a declaration from David Reiner stating that "Kindline" is merely a "doing business as" name associated with Kidline Enterprises, Inc. and is not an entirely distinct entity such that the 2020 arbitration agreement does not bind the partners of Kidline Enterprises, Inc. (Reiner Decl. ¶¶ 6, 7, 11). To the extent the Bankruptcy Court had reservations that there was a valid arbitration agreement, the current factual record assuages each concern. The Court therefore concludes that the record now supports a finding of a valid arbitration agreement.

B.  Signing Parties Are Compelled to Arbitration Under the FAA

1.    Legal Framework

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "party aggrieved by the . . . refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Reflecting a "liberal federal policy favoring arbitration" agreements, the FAA requires courts to place such agreements on "an equal footing with other contracts." *Edmundson v. Klarna, Inc.*, 85 F.4th 695 (2d Cir. 2023) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). A court deciding a motion to compel arbitration applies a "standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). In doing so, the court evaluates "[a]llegations related to the question of whether the parties formed a valid arbitration agreement . . . to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). Considering "all relevant, admissible evidence submitted by the parties," the court "draws all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74 (citations omitted).

Courts employ a four-step inquiry to decide a motion to compel arbitration, deciding: (1) "whether the parties agreed to arbitrate"; (2) "the scope of that agreement"; (3) "if federal statutory claims are asserted . . . whether Congress intended those claims

to be nonarbitrable"; and (4) "if the court concludes that some, but not all, of the claims in the case are arbitrable, . . . whether to stay the balance of the proceedings pending arbitration." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998), *abrogated on other grounds by Katz v. Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015)).

    2.    <u>Application</u>

        a.    <u>Agreement</u>

The Court must first evaluate whether there is valid agreement to arbitrate. *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015). "Under New York law, 'the party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate.'" *Biggs v. Midland Credit Mgmt., Inc.*, No. 17-CV-340 (JFB) (ARL), 2018 WL 1225539, at *8 (E.D.N.Y. Mar. 9, 2018) (quoting *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487 (NRB), 2004 WL 307238, at *5 (S.D.N.Y. Feb. 13, 2004)).

Before the Court are two written and signed arbitration provisions: the 2014 joint venture agreement and the 2020 arbitration agreement. In the 2014 joint venture agreement, Mr. Paneth and David Reiner agreed that:

> In the event any dispute or question between them arises G-d forbid, they shall be resolved only and exclusively before a third party who is acceptable to the parties, who shall determine the matter and his decision shall be final, with no right of appeal, and shall be considered as a partnership decision; under no circumstances shall they go before secular court in absence of rabbinical court permission.

(EJVA at 8–9; HJVA at 7 (signatures visible)).

The Joint Venture Agreement is contained in both Hebrew and English versions, includes signatures of the parties, and is accompanied by a certified English translation.

(EJVA, ECF No. 12-5). Kidline Enterprises, Inc. was incorporated shortly thereafter with the same ownership structure reflected in the Joint Venture Agreement. (Kidline Cert. of Incorp., ECF No. 12-6). Plaintiffs allege that incorporation voided the Joint Venture Agreement, (Compl. ¶ 11 & n.2, n.6), but the record does not indicate any inconsistency between the corporate formation documents and the arbitration provision.

Pursuant to the 2020 arbitration agreement, Mr. and Mrs. Paneth and David Reiner agreed "to adjudicate all disputes between them by a[n] Arbitrator" and "to refer all disputes and matters in difference whatsoever between them in any way connected or arising out of abovementioned controversy to award, order and final binding determination of Rabbi Moishe Bergman." (2020 Arb. Agreement at 2). The agreement is signed by Mendel Paneth, Sury Paneth, David Reiner, and Yossi Reiner. (*Id.*; ECF No. 12-2 ("Reiner Decl.") ¶¶ 9–10 (identifying signatures)). Furthermore, the parties' conduct confirms their assent to arbitrate. Plaintiffs and David Reiner proceeded before Rabbi Bergman for more than two years in arbitration sessions held at Congregation Bnei Avrohom, during which they were represented by counsel. (Compl. ¶¶ 88–92, 162–164).

In light of the two written, signed arbitration clauses and Plaintiffs' active engagement in arbitration, the Court determines that the Reiner Defendants have demonstrated a valid arbitration agreement between Plaintiffs and David Reiner by a preponderance of the evidence, and that there is no genuine dispute of material fact as to the agreement's existence.[6] *See Biggs*, 2018 WL 1225539, at *9; *Meyer*, 868 F.3d at 74 (2d Cir. 2017).

---

[6] Alternatively, the Court has already determined that the Kings County Supreme Court's order compelling arbitration is entitled to preclusive effect under 28 U.S.C. § 1738. *See Reiner v. Paneth*, No. 24-CV-1402

b. Scope

Next, the Court considers whether, given a valid arbitration agreement, the issues before the Court fall under its purview. Courts should construe arbitration clauses "as broadly as possible," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (first quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995); then quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *In re MF Glob. Holdings Ltd.*, 571 B.R. 80, 92 (Bankr. S.D.N.Y. 2017) (finding arbitration was presumed where provision that covered "[a]ny and all disputes arising under or relating to this policy" was "plainly broad"). This is true even where granting a motion to compel would create "separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985).

Here, the joint venture agreement requires "any dispute or question" between Mendel Paneth and David Reiner to be arbitrated, and the 2020 arbitration agreement similarly requires Mendel Paneth, Sury Paneth, and David Reiner to arbitrate "all disputes and matters in difference whatsoever between them in any way connected or arising out of abovementioned controversy," referring to the parties' Kidline-related disputes. (EJVA at 8; 2020 Arb. Agreement at 2). While Plaintiffs' Sherman Act and civil RICO claims certainly fall under the broad wording of the joint venture agreement, the claims also arise inextricably out of Plaintiffs' disputes with David Reiner over Kidline's management,

---

(RER), 2025 WL 2663968, at *2–4 (E.D.N.Y. Sept. 17, 2025) (holding that the state court's order necessarily rested on a finding that Mendel Paneth executed a valid arbitration agreement and that plaintiffs are collaterally estopped from relitigating that issue). Therefore, even apart from the analysis set forth above, the Court could compel arbitration on preclusion grounds alone.

vendor relations, finances, competition with Hundred, as well as the arbitration clauses themselves. Construing these provisions broadly, as it must, the Court concludes the Sherman Act and civil RICO claims fall within the provisions' scope of arbitration.

      c. <u>Arbitrability</u>

As a matter of law, Sherman Act and civil RICO claims are arbitrable. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (noting that "RICO and antitrust claims" have been "found to be arbitrable"). Furthermore, if a claim is non-core to the bankruptcy, meaning it "does not depend on bankruptcy laws for its existence and . . . could proceed in a court that lacks federal bankruptcy jurisdiction," *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 620 B.R. 456, 463 (S.D.N.Y. 2020) (quoting *Dewitt Rehab. & Nursing Ctr., Inc. v. Columbia Cas. Co.*, 464 B.R. 587, 591 (S.D.N.Y. 2012)), "the court generally lacks discretion and *must* refer the claim to arbitration," *In re MF Glob. Holdings Ltd.*, 571 B.R. 80, 93 (Bankr. S.D.N.Y. 2017) (emphasis added). Here, Plaintiffs' claims against the Reiner Defendants are non-core, because they arise under the Sherman Act and RICO statute and therefore could proceed in any court.

Accordingly, the Court concludes that the parties entered into valid arbitration agreements, that the agreements encompass the Sherman Act and RICO claims at issue, and that such claims are arbitrable as a matter of federal law. Because all of Plaintiffs' claims against the Reiner Defendants are arbitrable, the Court need not reach the fourth step of the inquiry. The Court therefore grants the Reiner Defendants' motion to compel arbitration of these claims.

C. Non-Signatory Mendel Reiner Is Compelled to Arbitration Under Equitable Estoppel

Principles of equitable estoppel permit a non-signatory to an arbitration agreement to compel a signatory to arbitrate a dispute where, upon "a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them," the court determines that "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). Courts have found equitable estoppel when the signatory's claims "rel[ied] on the concerted actions of both defendants and [we]re therefore substantially interdependent." *Ragone*, 595 F.3d at 119 (permitting non-signatory producer to compel signatory employee to arbitrate her sexual harassment claims, where employee claimed the harassing conduct was condoned by both her signatory employer and non-signatory producer); *see also Reid v. Tandym Grp., LLC*, 697 F. Supp. 3d 62, 81–82 (S.D.N.Y. 2023) (finding signatory estopped from avoiding arbitration when signatory's "claims of unlawful conduct 'rel[ied] on the concerted actions of both defendants'" (quoting *Ragone*, 595 F.3d at 119*)); Shepherd v. Belkin Int'l, Inc.*, 683 F. Supp. 3d 282, 289 (E.D.N.Y. 2023) (compelling signatory-plaintiff to arbitrate claims with non-signatory based on "exactly the same conduct for precisely the same product," particularly where non-signatory "was a true middleman" whose alleged misconduct merely perpetuated signatory-defendant's misconduct).

Unlike the other defendants here, each group of whom has their own distinct set of interests, Mendel Reiner's interests and actions are inextricably bound up in those of

David Reiner. According to the complaint, Mendel Reiner was David Reiner's "collaborator," putting David's will into action. (Compl. ¶ 252). There is no claim against Mendel that does not relate to Plaintiffs' disputes with David. The antitrust and RICO allegations against Mendel Reiner, therefore, are "factually intertwined" and interdependent with those against David Reiner, and vice versa. *See Ragone*, 595 F.3d at 128. Arbitrating the latter set of allegations without the former would be inequitable.

D. Objections to Proofs of Claim Nos. 9 and 10 Are Stayed Pending Arbitration

Mr. Paneth also objects to the proofs of claim filed by David Reiner (Claim No. 9) and Kidline Enterprises Inc. (Claim No. 10).

The Federal Arbitration Act provides that when a claim before the court "involves an issue referable to arbitration under an agreement in writing," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. The question, therefore, is whether Mr. Paneth's objections to Claim No. 9 (Reiner) and Claim No. 10 (Kidline) involve arbitrable issues.

Although framed as an objection under 11 U.S.C. § 502, the pleading makes clear that the relief sought depends on the same allegations of "predatory and racketeering conduct," "unfair and deceptive acts," "excruciating covenants . . . not enforceable . . . but for the deception by Defendants," and "procedurally and substantively unconscionable" agreements. (Compl. ¶¶ 376, 381). Mr. Paneth further requests that the Court "liquidate the claims that he brings against the defendants and apply them to any and all claims of . . . Kidline Enterprises, Inc. . . . thereby reducing its claim to a nullity and thereby disallowing the Proof of Claim." (Compl. ¶ 380).

These allegations rest on fraud, unconscionability, and racketeering theories that are identical to the antitrust and civil RICO claims already referred to arbitration. Because the objection involves issues "referable to arbitration under [the] agreement in writing," the Court is bound by FAA section 3 to stay the objection pending arbitration.[7]

\*       \*       \*

For the foregoing reasons, the Court grants the Reiner Defendants' motion to compel arbitration and stays the objections to Proofs of Claim Nos. 9 and 10 pending arbitration. The Court next turns to the claims against those defendants who are not compelled to arbitration, beginning with Defendant Rabbi Moshe Bergman.

II.    Defendant Bergman's Motion to Dismiss Is Granted

Defendant Rabbi Moshe Bergman seeks to dismiss the complaint as against himself, arguing he enjoys absolute immunity as "as an arbitrator presiding over Plaintiffs' contractually agreed upon arbitration." (Bergman Mem. at 6). The doctrine of absolute arbitral immunity protects "arbitrators in contractually agreed upon arbitration proceedings . . . from liability in damages for all acts within the scope of the arbitral process." *Austern v. Chicago Bd. Options Exch., Inc.*, 898 F.2d 882, 886 (2d Cir. 1990), *cert. denied*, 498 U.S. 850 (1990). Arbitral immunity, similar to the judicial immunity from which it derives, protects functions rather than people, meaning arbitrators are immune only for acts performed in their arbitral capacity. *Id.* at 885–86. "[W]here courts have applied [the

---

[7] Even if Mr. Paneth's objections to Claim No. 9 (Reiner) and Claim No. 10 (Kidline) were deemed "non-arbitrable" because it arises in the context of the claims-allowance process, the Court would nonetheless stay the objection under its inherent power to control its docket. "[C]ourts recognize that a broad stay order is appropriate where there are common questions of fact between the arbitrable and nonarbitrable claims, and where issuing the order will promote the interests of judicial economy." *In re Durr Mech. Constr., Inc.*, No. 18 Civ. 13968 (DSJ), 2021 WL 2460976, at \*12 (Bankr. S.D.N.Y. June 16, 2021) (citing *In re S.W. Bach & Co.*, 425 B.R. 78, 98 (Bankr. S.D.N.Y. 2010)). Because the objection overlaps factually with Plaintiff's arbitrable RICO and antitrust claims, a stay avoids duplicative proceedings and promotes efficiency.

arbitral] immunity doctrine, they have typically done so to prevent arbitral losers from using administrative decisions as a vehicle to attack, indirectly, the outcomes of completed arbitrations." *Schorr v. Am. Arb. Ass'n Inc.*, No. 21 Civ. 5569 (PAE), 2022 WL 17965413, at *12 (S.D.N.Y. Dec. 27, 2022) (collecting cases).

By virtue of what the Court has determined to be a valid arbitration agreement between Plaintiffs, David Reiner, and Yossi Reiner (*see supra* Part I), Plaintiffs and David Reiner retained Bergman in May 2020 to arbitrate their disputes. (*See* Compl. ¶¶ 88–92). All allegations against Bergman relate to his actions as an arbitrator and occurred within the arbitral process: Plaintiffs allege he failed to follow through on his "initial promise of a quick resolution" and scheduled more arbitration sessions than initially discussed with Mendel Paneth; failed "to compel the corporation to bear arbitration costs" and instead required each party pay their fees individually; failed to address "restoring [Plaintiffs'] access to the Chase accounts and approving payment of bills"; "did nothing to force Reiner to provide a business appraiser"; "did nothing to maintain the status-quo such as directing Reiner to authorize payment of ordinary-course business expenses"; "refused to provide a copy" to Mrs. Paneth of the arbitration agreement she signed "unless 'both parties agreed'"; failed to request JRC Printing's records relating to the alleged overcharging; issued an Interim Decision that Plaintiffs disagreed with; unfairly gave David Reiner more time than Mr. Paneth to present during the arbitration sessions; "refused to allow a court reporter at the proceedings"; permitted Mendel Reiner but not Mr. Paneth to record a session on his phone; laughed at David Reiner's off-color joke at Mr. Paneth's expense (which, the Court notes, though potentially distasteful, is not actionable); and failed to "address" the Beis Yoseph Writ. (Compl. at ¶¶ 101, 109–10,

112–13, 115–16, 169–70, 203, 205–06, 210, 290). Although the arbitration here was never completed because Plaintiffs filed for bankruptcy before it could end (*id.* at 291), Plaintiffs challenge Bergman's Interim Decision, in which they were essentially "arbitral losers," as well as various actions that amount to "management of the arbitration" or were "taken to further the progress of arbitral proceedings," which have been found to fall under arbitral immunity. *Schorr*, 2022 WL 17965413, at *12 (collecting cases). Plaintiffs may disagree with Bergman's arbitral management and decisions—may even object that Bergman's actions did not "further" the arbitration because they did not further Plaintiffs' interests—but disagreement does not negate arbitral immunity. *See Austern*, 898 F.2d at 886 ("[I]ndividuals . . . cannot be expected to volunteer to arbitrate disputes if they can be caught up in the struggle between the litigants and saddled with the burdens of defending a lawsuit." (quotation omitted)).

Plaintiffs' counterargument that three religious authorities "authorized secular court resolution or removal of the arbitrator," (Pls.' Bergman Opp. at 3) is unavailing. As pleaded, these "authorizations" are conditional, requiring Plaintiffs' characterization of the events to be true, which cannot be determined definitely on a motion to dismiss. (Compl. ¶¶ 175 ("*If* these statements are correct . . . ."), 176 ("And *if* it is true and correct that this is how things are . . . ."), 177 ("*Where* the nature of the dispute between the parties was based upon untrustworthy behavior between partners as in the present case . . . .") (emphases added)). Moreover, advisory opinions, even if provided by "world-renowned" rabbinical legal thinkers, do not hold the weight of binding precedent and cannot eliminate arbitral immunity.

20

The Court therefore dismisses all claims against Defendant Bergman on the basis of arbitral immunity.

III.    <u>Defendant Congregation's Motion to Dismiss Is Granted</u>

In moving to dismiss the complaint, Defendant Congregation Bnei Avrohom argues that it is not vicariously liable for the actions of Defendant Bergman, and that there are no factual allegations on which it could possibly be held liable under RICO. (*See generally* Congregation Mem.) Plaintiffs allege no substantive facts against Congregation Bnei Avrohom, aside from stating that Rabbi Bergman is a religious leader of and is associated with the Congregation and conducts religious arbitration under its "auspices" (Compl. ¶¶ 36, 88), that Bergman has an office at Congregation Bnei Avrohom (*id.* ¶ 89), and that the arbitrations between David Reiner and Mendel Paneth occurred on the Congregation's property (*id.* ¶ 162). Aside from those four paragraphs, Plaintiffs merely lump Congregation Bnei Avrohom together in a conclusory fashion with all the other RICO defendants. (*See, e.g.*, *id.* ¶¶ 344, 346–47, 350, 352–353, 359, 362–64).[8]

Because the Court has already dismissed all claims against Defendant Bergman as barred by arbitral immunity (*see supra*, Part II), Defendant Congregation cannot be held vicariously liable for any of his actions or have any of the allegations against him imputed to it. To the extent that the Congregation may have engaged in the facilitation of the arbitration sessions, it enjoys arbitral immunity for the same reasons described above

---

[8] The Court notes that Plaintiffs attempt to bring in additional allegations and exhibits in their opposition to the Congregation's motion to dismiss. (Pls.' Congregation Opp.; ECF No. 22-2, Ex. F). The screenshots of the Congregation's website and conclusory allegations that the Congregation benefitted from drawn-out arbitration proceedings and plausibly "knew that something 'unusual' was going on at their premises [for the Paneth/Reiner arbitration], yet chose to ignore it" are insufficient to fill the egregious gaps in their claims against the Congregation. (Pls.' Congregation Opp. at 10–11).

for Bergman. Furthermore, the four sparse paragraphs of factual allegations mentioning the Congregation are insufficient to establish any sort of liability, vicarious or direct, under RICO: They indicate only that Bergman was acting under the "auspices" of the Congregation in his role as arbitrator in the parties' disputes (Compl. ¶¶ 36, 88), which is insufficient to establish any of the numerous RICO elements against the Congregation including, *inter alia*, conducting or participating in a RICO enterprise. (*See infra*, Part VI). The Court thus dismisses all claims against Defendant Congregation.

IV.    The Rabbi Defendants' First Amendment and Privilege Defenses Do Not Warrant Dismissal

The Court next considers the defenses raised by the Rabbi Defendants.

A.    Ecclesiastical Abstention Doctrine

In their motion to dismiss, the Rabbi Defendants argue that the Court lacks subject matter jurisdiction under the First Amendment's ecclesiastical abstention doctrine to consider Plaintiffs' claims against them. (Rabbi Mem. at 14–15), U.S. Const. amend. I. The First Amendment's ecclesiastical abstention, or church autonomy, doctrine prohibits "civil court interference in religious disputes." *Belya v. Kapral*, 45 F.4th 621, 628 n.4 (2d Cir. 2022). However, a court may adjudicate a civil dispute involving religious parties or institutions if it relies on "neutral principles" of secular law and avoids "deciding questions of religious doctrine, polity, and practice." *Moon v. Moon*, 833 F. App'x 876, 879 (2d Cir. 2020) (citing *Jones v. Wolf*, 443 U.S. 595, 602–04 (1979)); *see also Congregation Yetev Lev D'Satmar, Inc. v. Kahana*, 9 N.Y.3d 282, 286 (2007).

The Rabbis characterize Plaintiffs' allegations as being, in essence, that through disseminating flyers and other communications, "the Rabbis advised their followers to respect the determination of religious courts and not patronize a member of the

community believed to be stealing intellectual property from other members of the community." (Rabbi Mem. at 14; Compl. ¶ 256 (text of flyer)). The Rabbis argue that analyzing these allegations in the context of the Sherman Act and RICO claims would require the Court impermissibly to "delve into competing interpretations of Jewish law, the role of Rabbinical Courts, and the advice of Rabbis that congregants respect Rabbinical Court determinations." (*Id.* at 14–15). Specifically, they believed they had an obligation under religious law to inform their followers that a community member failed to comply with a rabbinical judgment, and argue that such activity cannot "serve as a predicate for a RICO" or antitrust claim. (Rabbi Reply at 5, 7). Analyzing this religious obligation, they argue, would require impermissibly resolving questions of religious doctrine, policy, or practice. (*See id.*) Plaintiffs counter that their claims, though involving religious entities, "are grounded in secular legal principles," *i.e.*, the antitrust and RICO statutes, and "do not implicate religious doctrines." (Pls.' Rabbi Opp. at 7).

The Rabbis cite several ecclesiastical abstention cases involving defamation, excommunication, and kosher foods. (Rabbi Mem. at 9–15 (citing, *e.g.*, *United Kosher Butchers Ass'n v. Associated Synagogues of Greater Bos., Inc.*, 349 Mass. 595 (1965) (kosher products); *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732 (D.N.J. 1999) (libel and slander), *aff'd sub nom. Klagsbrun v. Va'ad Harabonm of Greater Monsey*, 263 F.3d 158 (3d Cir. 2001); *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002) (kosher meat); *Abdelhak v. Jewish Press Inc.*, 985 A.2d 197 (N.J. App. Div. 2009) (defamation relating to religious divorce); *Ming Tung v. China Buddhist Ass'n*, 996 N.Y.S.2d 236 (1st Dep't 2014) (abstaining from determining validity of excommunication), *aff'd*, 26 N.Y.3d 1152 (2016)); Rabbi Reply at 6–7). In each case,

an issue of religious doctrine was at the heart of the dispute. For example, one plaintiff asked the court to determine that its products were authentically kosher, an inherently religious determination, and require the defendant to accept its products; the court, predictably, declined to do so. *United Kosher Butchers Ass'n*, 349 Mass. at 599. In the defamation case *Abdelhak*, the plaintiff alleged defendants falsely published that he had refused to religiously divorce his wife. *Abdelhak*, 985 A.2d at 203. In abstaining, the court explained that it could not analyze the alleged defamation unless it first assessed, among other issues, the religious "significance of a husband with-holding or giving a Get" (a religious divorce) and whether "plaintiff withholding and later giving the Get involves a matter of legitimate interest within the Orthodox Jewish community." *Id.* at 203, 207 (noting that impact of allegedly defamatory statement on receiving audience is integral to legal analysis).

While the Rabbi Defendants are correct that the actionable allegations against them boil down to the dissemination of the flyer and other alleged communications advising their followers not to patronize Hundred Magazine or aid Plaintiffs (*see* Compl. ¶ 256), the Rabbis' appeal to ecclesiastical abstention goes too far. If the Court were to credit the Rabbis' argument, any religious entity could appeal to the doctrine to avoid liability under secular law if their alleged wrongdoing was underlaid with even a hint of religious connection. Here, there is no need to make religious determinations of the type at issue in the Rabbi Defendants' cited cases. Plaintiffs' Sherman Act claims require the Court to assess whether the Rabbi and Reiner Defendants had (1) an agreement (2) to unreasonably restrain trade, *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (Sherman Act section 1); or whether the Rabbi and

Reiner Defendants (1) had monopoly power and (2) engaged in conduct causing anticompetitive or exclusionary effects, or whether they *attempted* monopolization by (1) engaging in anticompetitive or exclusionary conduct, (2) with the specific intent to monopolize, and had (3) a "dangerous probability of achieving monopoly power," *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015) (quotation omitted) (Sherman Act section 2). And Plaintiffs' RICO claims against the Rabbis require the Court to assess whether (1) each "defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an[] interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123–24 (2d Cir. 2018) (citation omitted).

For neither cause of action is the Court required to develop "a keen understanding of religious doctrine" necessitating ecclesiastical abstention. *See Abdelhak*, 985 A.2d at 210. To assess the Sherman Act and RICO elements as against the Rabbi Defendants, the Court must interrogate, in relevant part, motive behind any alleged agreement to restrain trade in the relevant market that would preclude a finding of non-actionable parallel conduct (for Sherman Act section 1), intent to monopolize (for Sherman Act section 2), and fraudulent intent (for RICO mail and wire fraud). In doing so, however, the Court need not interpret religious doctrine, such as, for example, the religious validity of the Beis Yoseph Writ (*see, e.g.*, Compl. ¶¶ 245, 275), whether the Rabbi Defendants' professed religious obligation to advise their followers to not support Hundred Magazine and Plaintiffs was genuine or improper (*e.g.*, *id.* ¶¶ 248–49, 256), or the impact of the flyers on the Rabbi Defendants' followers and the religious community at large (*e.g.*, *id.*

¶¶ 250, 256). Furthermore, because a court must accept all well-pleaded allegations as true on a motion to dismiss, it is inappropriate for the Court at this point to weigh the merits of the Rabbi Defendants' alleged religious obligations. Here, religious doctrine is not at the heart of the Sherman Act or RICO claims; only neutral principles of secular law are required to resolve this dispute. The Court rejects the Rabbi Defendants' request to apply the ecclesiastical abstention doctrine.

      B.    <u>Qualified Privilege</u>

The Rabbi Defendants also argue that, because they were speaking to their followers in the challenged communications and "have a common interest with their followers in being able to advise followers of their interpretation of Jewish law, particularly as applies to disputes within the religious community where religious courts are involved," the qualified privilege doctrine precludes this Court's review of the flyers and other alleged communications as predicate acts of the Sherman Act and RICO claims. (Rabbi Mem. at 15–17). In defamation cases, a defendant may assert qualified privilege as a defense, shielding from litigation a "communication made by one person to another upon a subject in which both have an interest." *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992) (quoting *Stillman v. Ford*, 22 N.Y.2d 48, 53 (1968)) ("[S]o long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded."); *see Berger v. Temple Beth-El of Great Neck*, 839 N.Y.S.2d 504 (2007) (religious organization has common interest). A plaintiff may dissolve the qualified privilege, however, if it shows the defendant spoke with malice, meaning spite or ill will, or with knowledge of the statement's falsity or reckless disregard for the truth. *Liberman*, 80 N.Y.2d at 437–38.

The Court first notes that this is not a defamation case; thus, the qualified privilege's applicability here is tenuous. But assuming it applies, while the Rabbi Defendants might have a common interest with their followers, Plaintiffs have alleged that they acted with the intent to harm the Paneths, or at least communicated with their followers knowing that some of their statements were false. (*See, e.g.*, Compl. ¶¶ 248 ("[N]otwithstanding knowledge of the falsity of the Eichenstein email, and that the underlying basis for the Beis Yoseph Writ had been extinguished because Mendel had attended and agreed to Eichenstein's Arbitration, David Reiner, Mendel Reiner, Rabbi Alt, Rabbi Landau, and Beis Yoseph again sought to create cumulative community pressure against Plaintiffs and their rights by the publication and circulation of the Beis Yoseph Writ throughout the Hasidic Community . . . ." (emphases omitted)), 249 ("The circulation of the Writ was intended to cause harm to Mendel, to Sury, and to Hundred."), 256 (text of flyer), 260, 273). These allegations of intent to harm, accepted as true at the pleading stage, preclude the Rabbi Defendants' common interest qualified privilege.[9]

\* \* \*

Having rejected both the ecclesiastical abstention doctrine and qualified privilege, and having referred the Reiner Defendants to arbitration and dismissed the claims against Defendants Bergman and Congregation Bnei Avrohom, the Court turns to the matters that remain. These are: (1) the Sherman Act claim against the Rabbi Defendants; (2) the

---

[9] As elaborated below, even though these allegations of intent to harm are sufficient to preclude the common interest qualified privilege, they are insufficient to establish the substantive Sherman Act and RICO causes of action.

RICO claims against the Rabbi Defendants, the Vendor Defendants, and Yosef Freund; and (3) Mr. Paneth's objection to Yosef Freund's Proof of Claim No. 12.

V.    <u>The Sherman Act Claim Against the Rabbi Defendants Is Dismissed</u>

In Count 1 of the complaint, Plaintiffs allege violations of sections 1 and 2 of the Sherman Act by the Reiner Defendants and the Rabbi Defendants. (Compl. ¶¶ 317–41). Because the claims against Reiner have been compelled to arbitration and the claims against Rabbi Bergman have been dismissed, the only defendants who remain on the Sherman Act count are the Rabbi Defendants.[10]

Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade, and section 2 prohibits unlawful monopolization. 15 U.S.C. §§ 1, 2. By prohibiting multiple types anticompetitive behavior, the Sherman Act aims to "protect[] competition as a whole in the relevant market, not the individual competitors within that market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). "Disputes between business competitors thus are not the proper subjects of antitrust actions." *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016) (*Am. Express I*), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) (*Am. Express II*). The Sherman Act's narrow applicability supports judicial economy and embodies the antitrust principle that "[p]rocompetitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages." *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

---

[10] This ruling is limited to the Rabbi Defendants and expresses no view on the sufficiency of Plaintiffs' Sherman Act claims as to the Reiner Defendants, which are subject to arbitration.

The Court addresses Plaintiffs' claims under Sections 1 and 2 of the Sherman Act in turn.

A.    <u>Section 1 of the Sherman Act</u>

Section 1 of the Sherman Act states, in relevant part, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal," with any violation a felony. 15 U.S.C. § 1. Under section 1 of the Sherman Act, plaintiffs can plead an unlawful agreement by asserting either (1) "direct evidence" of an unlawful agreement, or (2) "circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "[T]o survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

To state a claim under the direct agreement theory, plaintiffs must allege facts showing "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).

Alternatively, plaintiffs may seek to infer an agreement from allegations of parallel conduct. Parallel conduct alone is insufficient to establish an agreement, but may be sufficient where additional "plus" factors allow the court to infer a conspiracy. *See United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)). Plus factors include "a common motive to conspire,

evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). Otherwise, courts may view a defendant's conduct as "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"—unless plaintiffs show more than parallel conduct. *Twombly*, 550 U.S. at 554; *see Mayor and City Council of Baltimore*, 709 F.3d at 136–37.

Here, Plaintiffs fail to state a section 1 claim against the Rabbi Defendants under either theory recognized by the case law.

Plaintiffs do not allege facts showing that the Rabbi Defendants entered into a direct agreement with each other or with any other party. (Compl. ¶¶ 317–41). Plaintiffs assert that the Rabbi Defendants participated in efforts to block sales of Hundred's magazine in Jewish supermarkets and to socially boycott Plaintiffs and their children. (Compl. ¶¶ 329–31). But the complaint pleads no specific facts establishing a "meeting of the minds" between the Rabbi Defendants and any other party; at most, it describes independent actions consistent with their own interests. *See Copperweld Corp.*, 467 U.S. at 771.

Because the complaint pleads no direct agreement, Plaintiffs must rely on the alternative parallel conduct theory. That theory also fails. Plaintiffs fail to plead any "plus" factors that could transform lawful, self-interested conduct into an unlawful conspiracy. *See Apex Oil Co.*, 822 F.2d at 253–54.

First, the Rabbi Defendants' actions are consistent with their individual interests in encouraging aggrieved parties to seek dispute resolution through private religious courts instead of the secular courts. (Compl. ¶¶ 214–88). The Rabbi Defendants' individual economic and reputational interests could drive their alleged actions, such as soliciting Plaintiffs as clients. (Compl. ¶¶ 225, 230). If anything, the Court could infer from Plaintiffs' complaint that different Jewish tribunals competed with each other to solicit Plaintiffs' case instead of collaborating with each other to the Reiner Defendants' benefit. (*Id.*) Plaintiffs' suspicion that Rabbi Iliovits and Rabbi Yechiel Blum collaborated to obtain Plaintiffs' lucrative dispute further reinforces the Court's inference that the Rabbi Defendants pursued their individual financial interests rather than an unfounded agreement with the Reiner Defendants. (Compl. ¶ 230 n. 13).

Second, Plaintiffs point to circulation of writs and decisions to suggest coordination, but the complaint itself shows that the Reiner Defendants could have publicized the Rabbi Defendants' orders independently, without the Rabbis' approval or participation. (*See* Compl. ¶¶ 223, 252, 256, 257, 260, 261, 264). Without specific facts tying the Rabbi Defendants' alleged solicitations and actions to the Reiner Defendants, the Rabbi Defendants' actions are consistent with their individual economic interests as private religious tribunals. (Compl. ¶¶ 223, 225, 230, 252, 256, 257, 260, 261, 264). A private religious tribunal would likely want its decisions known among its followers. Without any "plus" factors, the Rabbi Defendants' actions merely amount to self-interested parallel conduct and are insufficient to establish an antitrust violation.

31

Because the complaint pleads no direct agreement and fails to allege any "plus factors" that could transform the Rabbi Defendants' parallel conduct into a conspiracy, the section 1 claim is dismissed as to the Rabbi Defendants.

B.    Section 2 of the Sherman Act

Section 2 of the Sherman Act makes it a felony offense to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2; *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015). "It is axiomatic that a firm cannot monopolize a market in which it does not compete." *RxUSA Wholesale, Inc. v. Alcon Lab'ys, Inc.*, 661 F. Supp. 2d 218, 227 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010) (citation omitted). "[A] defendant may be liable for conspiracy to monopolize where it agrees with another [company] to assist that [company] in its attempt to monopolize the relevant market, . . . [but] a defendant may only be held liable for monopolization or attempted monopolization if the defendant itself competed directly in that market." *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 185 (E.D.N.Y. 2006) (citations omitted).

Here, the complaint attributes monopoly power in the alleged Hasidic magazine market only to Reiner and Kidline. The Rabbi Defendants are not alleged to publish or distribute magazines, to participate in that market, or to possess monopoly power themselves. As a result, the sole section 2 theory potentially applicable to the Rabbi Defendants is conspiracy to monopolize. The Court therefore limits its analysis accordingly.

A claim for conspiracy to monopolize under section 2 requires a showing of: "[i] concerted action, [ii] overt acts in furtherance of the conspiracy, and [iii] specific intent to monopolize." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (quoting *Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988)). Applying this framework, the Court finds that Plaintiffs do not plausibly allege concerted action by the Rabbi Defendants directed toward monopolization of the Hasidic magazine market.

First, the factual narrative describes the Rabbis acting in their institutional roles—pressuring Plaintiffs to arbitrate, issuing or publicizing writs, or resigning when controversy arose. (*See, e.g.*, Compl. ¶¶ 227–33, 242–46, 254). None of these allegations suggest a reciprocal commitment with the Reiner Defendants to secure Kidline's dominance in the magazine market. At most, they reflect unilateral actions rooted in religious or adjudicative functions that David Reiner sought to exploit for his own advantage.

Second, the facts pleaded are equally—indeed more—consistent with independent, unilateral decisions by distinct tribunals than with a single conspiratorial compact. Plaintiffs themselves emphasize that Iliovits (CRC) and Blum (Mechon) were secretaries of competing Beis Yoseph (*id.* ¶ 232 n.14), that Beis Yoseph issued its own ex parte writ (*id.* ¶¶ 244–46), and that Eichenstein resigned rather than continue after controversy over his email (*id.* ¶ 254). The divergences among tribunals (*e.g.*, Beis Yoseph demanding a different arbitrator (*id.* ¶¶ 258–59)) and Eichenstein's resignation undercut any inference of a unified agreement among the Rabbi Defendants to pursue monopolization.

Third, the complaint identifies no plausible market-based motive for the Rabbi Defendants. They are not alleged to publish or distribute magazines, to profit from Kidline's market position, or to participate in removing Hundred from retail outlets. (*Id.* ¶¶ 261, 264, 281–84). The threats and writs are pleaded as tools to compel arbitration, enforce perceived religious-law obligations, or influence community behavior (*see, e.g.*, ¶¶ 227–33, 244–49, 257–59, 277–79), not as steps taken pursuant to a shared commercial design to acquire or maintain monopoly power in the magazine market. That alignment in outcome with Reiner's interests does not, without more, transform religious or adjudicative acts into an antitrust agreement to monopolize.

Because the allegations against the Rabbi Defendants do not plausibly suggest an agreement with the monopolistic objective required by section 2, the conspiracy-to-monopolize theory fails as to them. In light of that pleading deficiency on the agreement element, the Court need not address the remaining elements.

Accordingly, the Sherman Act claims are dismissed in their entirety as against the Rabbi Defendants.

VI.    <u>RICO Claims Against Rabbi Defendants, Vendor Defendants, and Yosef Freund Are Dismissed</u>

Counts 2, 3, 4, and 5 of the complaint allege that all Defendants violated sections 1962(c) and (d) of RICO (Compl. ¶¶ 342–47, 348–53, 354–65, 366–72), although only the Vendor Defendants, the Rabbi Defendants, and Yosef Freund remain. The Defendants argue that Plaintiffs' RICO claims fail because they "fail to plead the essential elements of any alleged predicate act" (mail and wire fraud, peonage, money laundering, computer hacking, Hobbs Act violation, and bankruptcy fraud); fail to allege either an open-ended or closed-ended pattern of racketeering activity; "fail to allege a cognizable

34

RICO enterprise" that operated as a continuing unit over time, had the requisite effect on interstate commerce, and whose affairs were directed by David and Mendel Reiner; fail to establish RICO standing because they "fail to allege injury to their business or property by reason of any alleged civil RICO violation"; and that because the substantive RICO claims fail, the RICO conspiracy claims also must fail. (Reiner Mem. at 33–55).

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) further makes it unlawful for "any person to conspire to violate" section 1962. *Id.* § 1962(d). "If a plaintiff fails to state a claim pursuant to 28 U.S.C. §§ 1962(a)-(c), a claim under section 1962(d) must fail as well." *Watkins v. Smith*, No. 12 Civ. 4635 (DLC), 2012 WL 5868395, at *3 (S.D.N.Y. Nov. 19, 2012), aff'd, 561 F. App'x 46 (2d Cir. 2014) (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004). Accordingly, the Court begins with the claim under section 1962(c).

A plaintiff bringing a RICO claim under 18 U.S.C. § 1962(c) must show "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains [an] interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123–24 (2d Cir. 2018) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)). "[A]lleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys

fees in federal court simply because they are cast in terms of RICO violations." *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1001 (E.D.N.Y. 1995) (citations omitted).

Under this framework, the Court addresses the section 1962(c) claim in two steps. First, it examines whether Plaintiffs have alleged predicate acts as to each remaining defendant. The Court finds that the allegations against the Vendor and Rabbi Defendants fail entirely, while the allegations against Yosef Freund plausibly implicate bankruptcy fraud. Second, the Court considers whether those allegations establish a "pattern" of racketeering activity. Because they do not, the claim against Yosef Freund also fails.

A. <u>Predicate Acts</u>

The RICO statute enumerates an exhaustive list of predicate acts that can constitute a pattern of "racketeering activity." 18 U.S.C. § 1961(1). "When bringing a RICO claim against multiple defendants, the plaintiff must allege that each defendant committed two or more predicate acts." *Atkins v. Apollo Real Est. Advisors, L.P.*, No. 05-CV-4365, 2008 WL 1926684, at *10 (E.D.N.Y. Apr. 30, 2008) (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)). Merely ascribing actions for the predicate acts "to all [d]efendants as an undifferentiated group, without identifying any role for [separate defendants] in particular," is conclusory, "fail[s] to meet the plausibility standard[,] and cannot survive a motion to dismiss." *Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, No. 14 Civ. 7349 (AJN), 2016 WL 1298987, at *5 (S.D.N.Y. Mar. 31, 2016) (citing *DeFalco*, 244 F.3d at 306; *Iqbal*, 556 U.S. at 681). The predicate acts must also have proximately caused the alleged RICO injury. *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (quoting *Empire Merchs., LLC v. Reliable Churchill LLP*, 902 F.3d 132, 140 (2d Cir. 2018)).

Plaintiffs allege seven predicate acts: mail and wire fraud, 18 U.S.C. §§ 1341, 1343; peonage, 18 U.S.C. § 1581; money laundering, 18 U.S.C. § 1956; "breaking into computers," 18 U.S.C. § 1030; Hobbs Act violation, 18 U.S.C. § 1951; and filing false claims in bankruptcy court, 18 U.S.C. § 152. (Compl. ¶¶ 346, 352, 362). Defendants argue that each predicate act fails for various reasons. Each is addressed in turn.

1.    Mail and Wire Fraud

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); *see* 18 U.S.C. §§ 1341, 1343. "The gravamen of the offense is the scheme to defraud . . . ." *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)). To establish a "scheme to defraud," the plaintiff must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted). "A 'scheme to defraud' is 'a plan to deprive a person of something of value by trick, deceit, chicane or overreaching.'" *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *Autuori*, 212 F.3d at 115).

Among the remaining defendants, Plaintiffs claim that Mr. Blumenthal made false The gravamen of statements while representing Tele Go Inc. in state court (Compl. ¶¶ 183–91), and that the Rabbi Defendants used email to convey false statements about Plaintiffs, which led to the issuance of the Beis Yoseph Writ (Compl. ¶¶ 242–44).

First, although the complaint recites mail fraud in conclusory terms (Compl. ¶¶ 346, 352, 362, 371), it pleads no facts showing that any Defendant used the mail, and therefore fails to state a RICO predicate act of mail fraud.

Second, Plaintiffs fail to allege that Mr. Blumenthal—or any Vendor Defendant— committed wire fraud. Their conclusory assertion that only David Reiner wanted arbitration does not establish a material misrepresentation. (Compl. ¶ 191). Nor do they plausibly allege that Blumenthal's state court filings involved interstate wires; those filings were made through New York's e-filing system in cases involving only New York parties, which courts have held insufficient to state wire fraud. *See*, *e.g.*, *Bernstein v. Misk*, 948 F. Supp. 228, 239 (E.D.N.Y. 1997) ("[W]here all parties are New York residents, all telephone calls are presumed to be intrastate and, absent any indication otherwise, the predicate act of wire fraud is not stated."). Furthermore, the allegations concern litigation conduct, which cannot constitute a RICO predicate act. *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) (holding that allegations of "frivolous, fraudulent, or baseless" litigation activity—such as preparing and filing false declarations in prior litigation—"cannot constitute a RICO predicate act").

Third, the wire fraud allegations against the Rabbi Defendants likewise fail. Plaintiffs' only possible wire fraud theory rests on an email that Rabbi Eichenstein allegedly sent after an arbitration session, which Plaintiffs claim "Speigel stayed behind after the meeting and had put immense pressure on Eichenstein to send that email." (Compl. ¶ 243). That allegation falls far short of Rule 9(b). *See* Fed. R. Civ. P. 9(b) (a plaintiff must "state with particularity the circumstances constituting fraud."). Here, Plaintiffs do not identify with particularity what portions of the email were false, why they

were false when made, or facts showing that Rabbi Eichenstein acted with "conscious knowing intent to defraud" or contemplated harm to property. Nor does an email summarizing arbitration proceedings constitute a scheme to obtain Plaintiffs' money or property. Finally, Plaintiffs allege no facts establishing that the email involved interstate wires or was in furtherance of a fraudulent scheme. A bare reference to "an email" is insufficient to plead wire fraud under RICO.

2.   Peonage

Plaintiffs allege that Defendants subjected to them to peonage. (Compl. ¶¶ 12–14, 218, 346, 352, 362–63; Pls.' Reiner Opp. at 36–37). 18 U.S.C. § 1581(a) prohibits holding "any person to a condition of peonage." "Peonage is compulsory service in payment of a debt that can be real or artificially created." *United States v. Sabhnani*, 599 F.3d 215, 243 (2d Cir. 2010). An indictment for peonage requires a showing that "the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force." *Id.* at 241 (quoting *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009)); *see also Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 443–45 (E.D.N.Y. 2013) ("threat of deportation alone may support a claim for forced labor," depending on factual context). Peonage is distinct from involuntary servitude in that in peonage, the forced labor "is tied to the discharge of an indebtedness." *Sulastri v. Halsey*, No. 12-CV-3538 (JS) (ARL), 2014 WL 4904718, at *11 (E.D.N.Y. Aug. 21, 2014) (citation omitted), *adopted by* 2014 WL 4904527 (E.D.N.Y. Sept. 30, 2014).

Plaintiffs allege that David Reiner engaged in an overarching scheme, involving multiple sub-schemes, to subjugate the Paneths[11] with help from all other Defendants. (Compl. ¶¶ 12, 218, 346, 352, 362–63; Pls.' Reiner Opp. at 36–37 ("[T]he *entire Complaint* recites a continual pattern of peonage through which Mendel became boxed-in and unable to escape from Kidline until his restrictive covenant expired (at which time he formed Hundred Enterprises, LLC).")). Most explicitly, in relation to Count 4, the religious enterprise RICO claim, Plaintiffs state that the "Count 4 Defendants' predicate acts of racketeering activity were all related in that they were all committed for the purpose of (1) advancing David Reiner [sic] interest, (2) keeping Mendel Paneth and Sury Paneth in involuntary servitude and making them servile to the interest of David Reiner and continue [sic] to exploit them beside threatening with social ostracism." (Compl. ¶ 363).

Plaintiffs fail to distinguish between the different Defendants for this alleged predicate act, impermissibly lumping them together. *See Worldwide Directories*, 2016 WL 1298987, at *5. Moreover, Plaintiffs have not made any well-pleaded allegations of fact that plausibly show that any of the Vendor Defendants or Rabbi Defendants forced either Plaintiff into a condition of peonage. Even if the Vendor Defendants provided poor

---

[11] Plaintiffs' meandering complaint makes many conclusory statements that David Reiner intended "to subjugate Mendel" and drive Plaintiffs "out of the role as co-equal partner and into a state of subservience." (Compl. ¶¶ 12, 18). Plaintiffs claim the "initial indicators" of this peonage scheme were several provisions in the joint venture agreement Mr. Paneth, David Reiner, and Eli Nadler signed in 2014, including that the partnership would continue for "an unlimited period of time" and would not be limited to Kidline or Kindline, the business or periodical; that the "business will engage in anything that involves the business of publishing reading material for youth"; and that dissolution of the partnership would require going before a third party arbitrator. (*Id.* ¶¶ 14–15). As Defendants argue, "[t]he terms of this voluntary agreement served to establish a joint venture—but it did *not* create a debtor-creditor relationship Mendel Paneth and David Reiner, or otherwise commit Mendel Paneth to a period of servitude in satisfaction of any debt to David Reiner." (Reiner Mem. at 38–39). Because all such matters between David Reiner and Plaintiffs have been referred back to arbitration, the Court refrains from deciding whether the joint venture agreement indicated and helped effectuate "Reiner's intent to subjugate Mendel" (Compl. ¶ 14), and focuses instead on the allegations against the Vendor Defendants, Rabbi Defendants, and Yosef Freund.

services to Kidline and Plaintiffs at the behest of David Reiner, that does not create an inference of peonage. Likewise, Plaintiffs may disagree with the Rabbi Defendants' actions, including issuing various writs and demanding arbitration, but requiring individuals to follow community rules and submit to arbitration does not create an inference that the Rabbi Defendants forced Plaintiffs into peonage.

Given that peonage links forced labor to the discharge of indebtedness, *see Sulastri*, 2014 WL 4904718, at *11, the Court addresses the allegations against Yosef Freund related to Plaintiffs' debt. Plaintiffs allege that in 2017, in anticipation of purchasing a house and at David Reiner's suggestion, they connected with Yosef Freund for assistance obtaining a mortgage. (Compl. ¶¶ 65–66). At Yosef Freund's suggestion, Mendel Paneth, who did not use credit cards and so had no credit score, transferred his stock in Kidline to Sury, who was the main applicant for the anticipated mortgage. (Compl. ¶¶ 17 n.4, 66–67). Plaintiffs allege that Yosef Freund lent them money for house renovations, but that when Yosef Freund arranged for a refinancing of Plaintiffs' home, the new loan had a high interest rate that caused them to be "trapped" in their Kidline jobs so they could afford the monthly mortgage payments. (Compl. ¶¶ 68–70).

However, allegations that Yosef Freund assisted two individuals to secure a mortgage and then refinance it, even if at a high interest rate, do not create the inference that Yosef Freund forced Plaintiffs to buy a house and renovate it, to take his loan or refinance in the specific way he suggested, or to work for him or in any specific job in order to pay off their debt. The Court thus finds Plaintiffs have failed to establish the RICO predicate act of peonage as to any of the above-mentioned Defendants.

3.    Money Laundering

To state a claim for money laundering under RICO, a plaintiff must plead: "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds." *Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592 (RCC) (KNF), 2005 WL 2347853, at *5 n.2 (S.D.N.Y. Sept. 22, 2005) (citing *United States v. Maher*, 108 F.3d 1513, 1527–28 (2d Cir. 1997)); *see also In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 559 (S.D.N.Y. 2011).

Plaintiffs allege that David Reiner directed Sury Paneth to write checks from Kidline to certain charities, including Congregation Tiferes Moshe and the New York-based Talmud Torah Ohr Moshe, "which would deposit the Kidline checks and give [David] Reiner back the cash," insinuating that David Reiner intended to "receive untaxed income." (Compl. ¶¶ 19(iv), 32, 69–76). However, Plaintiffs fail to connect any of the Vendor Defendants or Rabbi Defendants to these allegations. Although Plaintiffs list Talmud Torah Ohr Moshe under the section "Parties" (Compl. ¶ 32), Plaintiffs do not name this religious organization in the caption of the case nor anywhere else in the complaint, nor does any other party reference it as a party to this action; the Court declines, therefore, to consider it as a defendant in this action.

Although Yosef Freund is arguably connected to the payments (Compl. ¶¶ 62–63, 69–71), Plaintiffs' money laundering claims fail for another reason: plaintiffs do not allege

that these financial transactions involved proceeds of unlawful activity, or that these defendants know that the property involved represented the proceeds of unlawful activity, or that the transactions were designed to conceal the ownership, source, or control of the proceeds, all of which are essential elements of money laundering.

Plaintiffs also fail to plead that these transactions affected interstate commerce or involved the use of a financial system which engages in, or the activities of which affect, interstate or foreign commerce. *See* 18 U.S.C 1956(c)(4). Indeed, the pleadings identify the recipient entities as local New York religious institutions, and nothing in the Complaint suggests that the challenged transactions extended beyond New York. (Compl. ¶ 32). Without more to suggest that these payments affected interstate commerce, the Court cannot conclude that Plaintiffs meet the interstate commerce requirement. Therefore, the Court finds Plaintiffs fail to establish the RICO predicate act of money laundering as to any of the remaining Defendants.

####     4.    Computer Hacking

Defendants correctly note that the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, is not a predicate act under RICO. (Reiner Mem. at 41; Reiner Reply at 11). RICO predicate offenses are restricted to those listed in section 1961. *See*, *e.g.*, *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 586 (S.D.N.Y. 1995). Section 1961 does incorporate by reference "any act that is *indictable* under any provision listed in section 2332b(g)(5)(B) [entitled 'Acts of terrorism transcending national boundaries']," including sections 1030(a)(1) and 1030(a)(5)(A) of the CFAA. 18 U.S.C. § 1961(1). However, Plaintiffs do not allege that any computer related to this case meets all required elements of one of these provisions, which include obtaining information

43

relevant to "national defense or foreign relations," or knowingly transmitting a program, code, or command to intentionally damage a "protected computer." *Id.* §§ 1030(a)(1) and 1030(a)(5)(A). Moreover, to be *indicted* under either of these two provisions of the CFAA, a defendant must additionally have engaged in a "Federal crime of terrorism." *Id.* § 2332b(g). Though they make many allegations, Plaintiffs do not allege federal terrorism, nor do they meet the other statutory requirements to properly allege a RICO predicate act under the CFAA.

  5. <u>Hobbs Act Violation</u>

  Plaintiffs allege broadly that Defendants violated the Hobbs Act. (Pls.' Reiner Opp. at 29 (referring to the "Anti-Hundred Scheme" alleged at Compl. ¶¶ 21–22, 214–88)). The Hobbs Act forbids actual or attempted robbery or extortion, or a conspiracy to do so, that affects interstate commerce "in any way or degree." 18 U.S.C. § 1951.[12] Plaintiffs do not specify whether they bring claims under the robbery or extortion branches of the Hobbs Act, but the Court addresses Plaintiffs' allegations under each branch separately.

  a. <u>Robbery</u>

  A defendant commits Hobbs Act robbery when he (1) unlawfully takes or obtains (2) the victim's tangible personal property (3) from the victim's person or in their presence, (4) against the victim's will, (5) through force, threatened force, violence, or fear of injury (6) to the person or property of the victim, a relative of the victim, or anyone in the

---

[12] "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a).

presence of the victim at the time of the taking or obtaining. 18 U.S.C. § 1951(b)(1);[13] *see United States v. Taylor*, 596 U.S. 845, 850–51 (2022). For Hobbs Act robbery, "fear of injury" means "a fear of an injury derived from force." *United States v. Bryant*, No. 22-CR-318 (S-1) (ARR), 2023 WL 5046811, at *4 (E.D.N.Y. Aug. 8, 2023) (citing *United States v. Pena*, 161 F. Supp. 3d 268, 279–81 (S.D.N.Y. 2016); *United States v. Pena*, 190 F. Supp. 3d 317, 321 (E.D.N.Y. 2016)).

Nowhere do Plaintiffs allege that any Defendant engaged in violence, nor that anyone experienced "fear of an injury derived from force" in connection to Defendants taking that person's property against their will. *See Bryant*, 2023 WL 5046811, at *4. The only reference to "force" is the allegation that smaller grocery stores were "victims of forceful removal of [Hundred] Magazine by [Mendel] Reiner and his crew." (Compl. ¶ 284). Elsewhere Plaintiffs state that Mendel Reiner "hir[ed] 'enforcers' to remove Hundred Magazine from Jewish grocery stores and supermarkets" (*id.* ¶ 261), and that he and "his agents" exhibited the Beis Yoseph Writ and the flyer to such stores and thereby "caused copies of Hundred Magazine to be removed from their shelves" (*id.* ¶ 264).

These allegations are conclusory and thus insufficient to establish Hobbs Act robbery as against Yosef Freund, the Vendor Defendants, or the Rabbi Defendants. Plaintiffs do not mention Yosef Freund or the Vendor Defendants at all in relation to the alleged forceful removals. (*See* Vendor Mem. at 11). Plaintiffs' claims regarding the Rabbi

---

[13] "The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

Defendants amount to allegations that some of them published the Beis Yoseph Writ, which Reiner and his "collaborators[] and facilitators" distributed "throughout the Hasidic community" (Compl. ¶ 256), and potentially also prepared the Hebrew-language flyer or "notice" that Mendel Reiner showed to the grocery stores in conjunction with the forceful removals. (*Id.* ¶¶ 244 ("On February 24, 2021, . . . Beis Yoseph, through its Secretary Rabbi Asher Landau, and its Chief Judge, Rabbi Reuven Pinchas Alt, published the threatened Ikul (Writ and Preliminary injunction) [the 'Beis Yoseph Writ'], declaring that *No person is allowed to assist them [Mendel and Sarah] in any way, including printing and distribution, etc. the newspaper 'Hundred' until the defendants have complied with the above-mentioned ruling* [requiring them to sign a rabbinical arbitration agreement][.]"), 256 ("Accompanying the Writ was an incendiary and threatening Hebrew notice prepared by Reiner and his facilitators, intended to place the fear of G_d into anyone who offered Hundred Magazine for sale."). First, publishing the Writ in itself is not sufficiently connected to the "forceful removals": The Writ does not state that copies of Hundred Magazine should be forcefully removed from grocery stores, nor does the complaint allege that, in publishing the Writ, the Rabbi Defendants explicitly intended for Mendel Reiner and his "enforcers" to use the Writ to forcefully remove Hundred Magazine from grocery stores. Encouraging the community not to assist in the printing and distribution of a magazine (*id.* ¶ 244) is materially different from aiding and abetting the robbing of grocery stores—and certainly does not constitute the sort of violent robbery contemplated by the Hobbs Act. *See Bryant*, 2023 WL 5046811, at *4.

Second, Plaintiffs do not specify who Reiner's "facilitators" were who "distributed the Writ throughout the Hasidic community" and "prepared" the notice (*id.* ¶ 256), or who

46

was a member of Mendel Reiner's "crew," "enforcers," or "agents" who participated in the "forceful removal" of Hundred Magazine from various grocery stores (*id.* ¶¶ 261, 264, 284), or whether either group included Yosef Freund or any of the Vendor or Rabbi Defendants. By lumping defendants together and failing to specify which acts were performed by which individuals, Plaintiffs fail to plead these RICO predicate acts as to each individual defendant, as is required. *See Worldwide Directories, S.A. De C.V.*, 2016 WL 1298987, at *5; *New Falls Corp. v. Soni Holdings, LLC*, No. 19-CV-0449 (ADS) (AKT), 2020 WL 13850728, at *4 (E.D.N.Y. Mar. 31, 2020) ("The Plaintiff cannot utilize 'group pleading' describing the Defendants actions collectively to remedy the inadequacy of the allegations against [an individual defendant] in particular." (quoting *Franzone v. City of New York*, No. 13-cv-5282, 2015 WL 2139121, at *9 (E.D.N.Y. May 4, 2015)).

Furthermore, when read in the context of the entire "Anti-Hundred Scheme" section (Compl. ¶¶ 214–88), the allegations of the "forceful removal" are entirely too vague and conclusory to establish the nonconsensual taking required for Hobbs Act robbery. *See, e.g.*, *Tooker v. Guerrera*, No. 15-CV-2430 (JS) (ARL), 2016 WL 4367956 (E.D.N.Y. Aug. 15, 2016) (determining that plaintiff failed to establish RICO predicate acts of Hobbs Act robbery where plaintiff conclusorily alleged that defendants "stole the Plaintiff's home using threats of fear and violence," without further elaboration (cleaned up)). Indeed, the allegations could equally indicate that the grocery stores *voluntarily* removed Hundred Magazine from their shelves after viewing the flyer and/or the Writ, or that Mendel Reiner's "enforcers" physically removed the Magazines from the stores without consent. (*Compare* Compl. ¶ 264 *with id.* ¶ 284). For all the above reasons, Plaintiffs' Hobbs Act robbery claims fail as against Yosef Freund and the Vendor and the Rabbi Defendants.

b. Extortion

A defendant commits Hobbs Act extortion when he (1) obtains the victim's tangible or intangible property, (2) with the victim's consent, (3) by inducing such consent (4) through wrongful use of force, threatened force, violence, or fear (including fear of economic and reputational harm), or under color of official right. 18 U.S.C. § 1951(b)(2);[14] *United States v. Gotti*, 459 F.3d 296, 324–25 (2d Cir. 2006) (threat of economic harm); *United States v. Jackson*, 180 F.3d 55, 71 (2d Cir. 1999) (threat of reputational harm), *on reh'g*, 196 F.3d 383 (2d Cir. 1999). A defendant must not merely deprive the victim of the property, but actually obtain the property for himself. *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *47 (E.D.N.Y. Sept. 7, 2013) ("To establish extortion, a plaintiff must demonstrate that the person committing the act either pursued or received something of value that he could exercise, transfer, or sell." (cleaned up)), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015) (summary order); *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 405 (2003).

In the lengthy section of the complaint that Plaintiffs, without elaboration, claim lays out Hobbs Act violations (*see* Pls.' Reiner Opp. at 29 (citing Compl. ¶¶ 21–22, 214–89)), Plaintiffs allege one instance of "fear" (Compl. ¶ 256 (the Hebrew-language notice was "intended to place the fear of G_d into anyone who offered Hundred Magazine for sale")); several allegations of "force," namely that Mendel Reiner and his "enforcers," "agents," and/or "crew" forcefully removed Hundred Magazine from Jewish grocery stores[15] (*id.*

---

[14] "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

[15] As noted above, Plaintiffs do not specify whether the removals were with or without the grocery stores' consent.

¶¶ 261, 264, 284); and several references to economic harm and reputational harm (*id.* ¶¶ 218 (Anti-Hundred Antitrust scheme was "aimed at destroying Mendel's personal reputation and putting Hundred Magazine out of business"), 233 ("Reiner coopted a segment of the Jewish Court system to be his tool in preventing Hundred Magazine from being a competitor to Kindline Magazine.")). Plaintiffs also appear to allege that the various Beis Din were attempting to use threats of reputational harm to coerce Plaintiffs into using their respective rabbinical arbitration services, which can be lucrative for such courts. (*See* Compl. ¶ 230 & n.13).

In addition to being insufficient to establish Hobbs Act robbery, as determined above, these allegations also cannot establish Hobbs Act extortion. As to the "fear" and "force" allegations, when read in its strongest light, the complaint claims that Mendel Reiner and his enforcers induced the grocery stores to hand over their inventories of Hundred Magazine (the "forceful removals") (*see id.* ¶¶ 261, 264, 284), by showing them the Hebrew-language notice "prepared by Reiner and his facilitators, [which was] intended to place the fear of G_d into anyone who offered Hundred Magazine for sale" (*id.* ¶ 256). However, as noted above, Plaintiffs do not specify who these "enforcers" were, nor whether they included Yosef Freund or any of the Vendor or Rabbi Defendants. Without that specificity, Plaintiffs cannot establish Hobbs Act extortion for those acts as against Yosef Freund or the Vendor or Rabbi Defendants.

None of the other alleged threats of economic or reputational harm (*e.g.*, Compl. ¶¶ 218, 233) involved Yosef Freund or any Vendor or Rabbi Defendant obtaining or attempting to obtain Plaintiffs' property, as required for Hobbs Act extortion. Even if the Rabbi Defendants attempted, by threatening social ostracization should Plaintiffs fail to

submit to rabbinical arbitration, to induce Plaintiffs to sign up for rabbinical arbitration with their respective Beis Din, which would have required Plaintiffs to pay them arbitration fees (*see id.* ¶ 230), the Complaint contains no facts showing even a substantial step toward obtaining such fees. *See Scheidler*, 537 U.S. at 404 (finding that extortion requires "not only the deprivation but also the acquisition of property.").

Accordingly, the Court finds Plaintiffs have failed to establish Hobbs Act extortion as against Yosef Freund, the Vendor Defendants, or the Rabbi Defendants.[16]

6.    <u>Bankruptcy Fraud</u>

Section 152 prohibits the making of various false statements in, or in relation to, bankruptcy proceedings when done "knowingly or fraudulently." Allegations of bankruptcy fraud must meet Rule 9(b)'s heightened pleading requirements, as must allegations of any fraudulent predicate act, and "give rise to a *strong* inference of fraudulent intent." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)). Plaintiffs object in conclusory terms to proofs of claim submitted by David Reiner, Kidline, and Yosef Freund (Compl. ¶¶ 373–381), and allege in more detail that Yosef Freund filed false documents in connection with Plaintiffs' bankruptcy filings (*id.* ¶¶ 293–311). Plaintiffs allege no bankruptcy fraud-related facts with respect to the Rabbi or Vendor Defendants. Because all disputes with David Reiner have been referred back to arbitration and Kidline is not a party here (and moreover there are no factual allegations regarding the truth or

---

[16] Additionally, the complaint does not appear to satisfy the Hobbs Act's jurisdictional element. All relevant parties are New York–based, and the alleged attempts to coerce Plaintiffs into rabbinical arbitration appear to have occurred wholly within the state. Nothing in the complaint suggests any effect on interstate commerce. *See* 18 U.S.C. § 1951(a).

fraudulence of their proofs of claim), the Court addresses only the allegations relating to Yosef Freund.[17]

Specifically, Plaintiffs allege that on October 3, 2022, on the day Mr. Paneth's bankruptcy attorneys filed a motion to approve a contract for the sale of Plaintiffs' residence, Yosef Freund knowingly filed with the Office of the Clerk of Richmond County false documents with a false signature purporting to assert a lien against the interest of Plaintiffs in their residence. (*Id.* ¶¶ 293–95). The documents were false because Plaintiffs allege they had repaid any loans to Yosef Freund as of March 2021. (*Id.* ¶ 295). The alleged "sole reason" Yosef Freund filed the lien "was his desire to obtain leverage to extract funds that he was not entitled to, from the anticipated sale of the Paneth homes." (*Id.* ¶ 297). Yosef Freund later filed his signed proof of claim, Claim No. 12, in the underlying bankruptcy proceeding, including in the sum total the allegedly false lien and checks "purportedly written to or on behalf of Mendel." (*Id.* ¶¶ 299–300). Plaintiffs claim the checks and any other loans were also fully paid before March 2021, which Yosef Freund knew when he signed and filed the proof of claim. (*Id.* ¶¶ 302, 308).

Taking Plaintiffs well-pleaded allegations as true, as we must at this stage, the Court finds them sufficient to show that Yosef Freund may plausibly have "knowingly or fraudulently" filed various false statements in, or in relation to, bankruptcy proceedings, in violation of 18 U.S.C. § 152. Yosef Freund arguably even engaged in *two* predicate acts of bankruptcy fraud: filing the allegedly false lien with the clerk's office, and filing the allegedly false proof of claim in the bankruptcy proceeding. (*Id.* ¶¶ 293–95). Nevertheless,

---

[17] Because Yosef Freund is not represented by counsel, the motion papers provide limited analysis on the allegations against him. Instead, as explained above, the Court *sua sponte* addresses the claims against Yosef Freund.

as the rest of this Part reveals, as Plaintiffs have failed to establish the other critical elements of a RICO claim, Yosef Freund's predicate acts do not in themselves save Plaintiffs' causes of action. Without successfully pleading all RICO elements, Plaintiffs may not survive the motions to dismiss filed by the Rabbi and Vendor Defendants.

 B. <u>Pattern of Racketeering Activity</u>

  To prevail on a claim under section 1962(c), a plaintiff must show that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "To establish a pattern, a plaintiff must identify at least two predicate acts and show that (1) the acts are related both to each other (horizontal relatedness) and to the enterprise (vertical relatedness) and (2) the conduct continued over a substantial period of time." *Halvorssen v. Simpson*, 807 F. App'x 26, 29 (2d Cir. 2020) (citing *Reich v. Lopez*, 858 F.3d 55, 60–61 (2d Cir. 2017)). Continuity may be established via either an open-ended or closed-ended pattern. *See Reich*, 858 F.3d at 60.

  Plaintiffs allege that "during the pendency of this bankruptcy case Yoseph Freund filed false documents in the Office of the Richmond County Clerk and on the Claims Register in this Court" (Compl. ¶ 293), specifically a purported lien against the Paneth residence filed on October 11, 2022 (*id.* ¶¶ 293–95), and a proof of claim filed on December 19, 2022 (*id.* ¶¶ 299–300). These allegations, however, fall short of establishing either form of continuity.

  First, these allegations do not establish closed-ended continuity. Close-ended continuity involves a series of related predicate acts extending over a period of at least two years with no threat of future continuation. *See Reich*, 858 F.3d at 60; *see also Spool*

*v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . '[t]he activities alleged involved only a handful of participants' and do not involve a 'complex, multi-faceted conspiracy.'" (citations omitted)). The Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" *Cofacrédit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999); see also *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995) (eleven months insufficient). Here, Plaintiffs allege only two filings: Yosef Freund's October 2022 lien in Richmond County and his December 2022 proof of claim in bankruptcy court. (Compl. ¶¶ 293–300). That alleged conduct spans at most two months, which is far short of the "substantial period of time" required for closed-ended continuity.

Nor do Plaintiffs allege facts suggesting open-ended continuity. Open-ended continuity requires a "threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 185 (quoting *Cofacrédit,* 187 F.3d at 243). "[A]n 'inherently terminable' scheme does not imply a threat of continued racketeering activity." *Cofacredit*, 187 F.3d at 244. When "the enterprise primarily conducts a legitimate business . . . there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Spool,* 520 F.3d at 185 (2d Cir. 2008) (quoting *Cofacrédit*, 187 F.3d 243). Here, the complaint describes only two filings within the span of a few months during a single

bankruptcy proceeding. Such a scheme is "inherently terminable" because it is tethered to Mr. Paneth's bankruptcy case and would end once that case concludes.

Accordingly, Plaintiffs have failed to plead a pattern of racketeering activity, and their RICO claim against Yosef Freund must be dismissed.

\* \* \*

In sum, Plaintiffs have failed to plead any predicate acts against the Vendor or Rabbi Defendants, and the allegations against Yosef Freund do not establish a pattern of racketeering activity. Accordingly, Plaintiffs' § 1962(c) claim must be dismissed.[18] The section 1962(d) conspiracy claim fails for the same reason. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004). The Court therefore dismisses Plaintiffs' RICO claims against the Vendor Defendants, the Rabbi Defendants, and Yosef Freund.

VII.     <u>Objection to Proof of Claim No. 12 Is Overruled</u>

The Court next addresses Mr. Paneth's objection to the proof of claim filed by Yosef Freund (Claim No. 12). Characterizing his objection as a "counterclaim," Mr. Paneth seeks relief under a theory of "recoupment," requesting that the Court "liquidate" or "setoff" the value of his Sherman Act and civil RICO claims against any claims filed David

---

[18] The Court notes, however, that the complaint is deficient in other respects—for example, Plaintiffs have not plausibly alleged RICO damages. Civil RICO requires injury to "business or property" by reason of the alleged violation. 18 U.S.C. § 1964(c); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). The "existence of an intervening decision-maker" may indicate insufficient directness to satisfy proximate cause, but not in all cases. *Alix v. McKinsey & Co.*, 23 F.4th 196, 206 (2d Cir.), cert. denied, 143 S. Ct. 302 (2022) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008)). Here, Plaintiffs claim their RICO injuries are their business failures. But for each of the predicate acts discussed above, Plaintiffs' "theory of liability rests on the independent actions of third and even fourth parties," *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 15 (2010), such as individual consumers deciding whether to purchase *Hundred Magazine*. Those intervening decisions break the causal chain and thus cannot establish proximate cause for Plaintiffs' alleged harms.

Reiner, Kidline Enterprises Inc., and Yosef Freund in the underlying bankruptcy. (*Id.* ¶¶ 374, 379–380). Additionally and in the alternative, Mr. Paneth objects to the proofs of claim on the grounds that "the underlying agreements, [sic] produced paperwork are procedurally and substantively unconscionable." (*Id.* ¶ 381).

Two provisions govern objections to proofs of claim, 11 U.S.C. § 502 and Federal Rule of Bankruptcy Procedure 3001. A proof of claim properly filed under Rule 3001 "is prima facie evidence of the claim's validity and amount." Fed. R. Bankr. P. 3001(f). Furthermore, a proof of claim filed pursuant to the Bankruptcy Code "is deemed allowed" unless a party in interest objects that the claim falls into one of the nine categories listed section 502(b). 11 U.S.C. § 502(a), (b). "The party objecting to the proof of claim has the burden of going forward with sufficient evidence (i) to rebut the validity or amount of the claim asserted or (ii) to show the claim should be disallowed." *Compare In re Gallagher*, 657 B.R. 195, 199, 201 (Bankr. E.D.N.Y. 2023) (overruling objection where debtor failed to sufficiently "rebut the validity, priority or amount" of claim), *and In re Cocoa Servs., L.L.C.*, No. 17 Civ. 11936 (JLG), 2018 WL 1801240, at *16 (Bankr. S.D.N.Y. Apr. 13, 2018) (overruling objection where debtors failed to "allege facts or law in support of the claim objection"), *with In re Aiolova*, No. 11 Civ. 10503 (BRL), 2013 WL 5818893, at *4 (Bankr. S.D.N.Y. Oct. 29, 2013) (sustaining objection to proof of claim where objector highlighted discrepancies between claim and claimant's prior affidavits and evidentiary submissions and thereby "presented sufficient evidence to refute the allegations in the Claim").

Here, as a threshold matter, the Court finds that Mr. Paneth has failed to plausibly rebut the validity or amount of the claim asserted by Yosef Freund. Mr. Paneth's objection

rests principally on a theory of recoupment or setoff based on RICO allegations. (Compl. ¶¶ 374, 379–380). But the RICO claims against Yosef Freund are dismissed for failure to state a claim.

Nor has Mr. Paneth plausibly alleged that the underlying agreements are unconscionable. The only facts pled in this regard concern Yosef Freund's assistance in arranging Plaintiffs' 2017 home purchase and 2018 refinance. (*Id.* ¶¶ 67, 70). But those allegations—chiefly that the refinance carried a 6.5% variable interest rate and left the Plaintiffs with high monthly payments—do not establish unconscionability. (*Id.* ¶ 70). They show neither the absence of meaningful choice nor terms so oppressive as to shock the conscience. See *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10–11 (1988) ("A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'") At most, they reflect financial strain, not a legally unconscionable bargain.

Accordingly, because Mr. Paneth has not plausibly rebutted the validity or amount of the claim, the objection to Yosef Freund's proof of claim (Claim No. 12) is overruled.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court grants the motion to compel arbitration (ECF No. 12) and grants the motions to dismiss filed by the remaining defendants (ECF Nos. 10, 13, 15, 16). The claims against Yosef Freund are also dismissed *sua sponte* for

failure to state a claim. In addition, Mr. Paneth's objections to Proofs of Claim Nos. 9 and 10 are stayed pending arbitration.

SO ORDERED.

Hon. Ramón E. Reyes, Jr.    Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2025.09.30 11:53:21 -04'00'
_____

RAMÓN E. REYES, JR.
United States District Judge

Dated: September 30, 2025
         Brooklyn, New York